Theodore Roosevelt GIBSON,
Jr., Appellant,

v.

Robert F. ZAHRADNICK, Superintendent, Virginia State Penitentiary,
Appellee.

No. 77–1415.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1977.

Decided July 19, 1978.

Stephen W. Bricker, Richmond, Va., for appellant.

Jerry P. Slonaker, Asst. Atty. Gen., Richmond, Va. (Anthony F. Troy, Atty. Gen., Richmond, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, FIELD, Senior Circuit Judge, and THOMSEN *, Senior District Judge.

HAYNSWORTH, Chief Judge:

Gibson was convicted in a Virginia state court for the first degree murder of his estranged wife and for the second degree murder of his father-in-law. The prosecution proved Gibson's identity as the assailant primarily through the testimony of a state-employed psychiatrist, who told the jury that Gibson admitted to him during the examination that Gibson had shot and killed his wife and father-in-law.

Gibson appealed his conviction to the Supreme Court of Virginia, on the ground, among others, that his inculpatory statement to the psychiatrist should not have been admitted in evidence to prove his guilt. That court affirmed the conviction. *Gibson v. Commonwealth*, 216 Va. 412, 219 S.E.2d 845 (1975), and the United States Supreme Court denied certiorari, 425 U.S. 994, 96 S.Ct. 2207, 48 L.Ed.2d 819 (1976).

The federal district court denied Gibson's petition for a writ of habeas corpus. We reverse and hold that a writ of habeas corpus should be issued on the ground that introduction of the inculpatory statement at trial to prove Gibson's guilt violated Gibson's constitutional privilege against self-incrimination.

### I.

Gibson and his wife, Marian, became embroiled in marital difficulties in consequence of which she, with their two children, moved out of the house and into the home of her father, while Gibson went to live with his mother. Bitterness developed between the couple, and in February 1974, Gibson shot and wounded his estranged wife and their daughter. Gibson was arrested under charges of felonious assault and was placed under bond. There was lay testimony at Gibson's trial that Gibson was extremely upset by his separation from his wife and his children, by the pendency of the assault charges and by serious business reverses that he encountered. On a tape recorder he dictated a suicide message, in which he stated that life was not worth living without his wife and children and that he intended to terminate his life. He delivered the tape to his mother with in-

* Senior District Judge for the District of Maryland, sitting by designation.

structions that she listen to it after his death.

On April 10, 1974, Gibson's son telephoned him complaining that his mother had denied him food at mealtime. This led to an angry telephonic exchange between Teddy Gibson and Marian. At trial the prosecutor's contention was that Teddy went to the home of his father-in-law later that evening and hid behind some bushes until his father-in-law and Marian arrived. Gibson then stepped from behind the bushes, killing the father-in-law with a blast from a buckshot loaded shotgun. Marian ran next door to the home of her sister. The sister heard Marian's cries for admittance and pleas to "Teddy" not to kill her. Just as the sister was opening the door, however, there was a second blast from the shotgun and Marian fell dead into the entrance way of the sister's house. Since it was dark, the sister did not see the assailant, though earlier another neighbor had seen a man approximating Gibson's size and build in the yard of the father-in-law's house.

Five days later, Teddy Gibson was arrested. In the lock-up room in the courthouse, Gibson removed all of his clothes and persistently talked into a sink, seemingly believing that some one was engaged in an animated conversation with him through the sink. Later that day, after he had been transferred to the jail, Gibson literally tore one of his ears from the side of his head. Gibson and his ear were rushed to the Medical College of Virginia, and the ear was sewn back on to his head, and he was later examined by psychiatrists. According to the psychiatrists, Gibson believed that a microphone had been implanted in his ear; he tore off his ear in an attempt to get the microphone out, and he believed that the surgery had as its partial purpose the actual extraction of the microphone.

Dr. John Mullaney, one of the psychiatrists at the Medical College of Virginia who examined Gibson, wrote on April 16 and 19 that Gibson was "in a very paranoid state, distrusting medication, being called by someone with a tape recorder who reads his thoughts and sends him replays, et cetera, with other schizophrenic signs about thought disorder, labile and inappropriate effect, to the point of confusion and agitation." (Transcript 102–03.) The jury could have found from Dr. Mullaney's report and his explanatory testimony at trial that a few days after the killings, Gibson was completely out of touch with reality and was legally insane. But Dr. Mullaney was unable to say whether Gibson's condition had existed at the time of the killings, and he acknowledged that the killings *could* have caused the condition.

Meanwhile, a lawyer had been appointed to represent Gibson. He sought and obtained a court order that Gibson be examined by a private psychiatrist in Richmond. Dr. Mullaney concluded, however, that when Gibson's ear was sufficiently healed to permit his discharge from the hospital by the surgeon, Gibson's mental condition was such that he could not be cared for in the city jail. He reported that a transfer of Gibson to the Central State Hospital was requisite. This occasioned the cancellation of the order for private psychiatric evaluation and a new court order transferring Gibson to Virginia Central State Hospital for a determination of his insanity and competence to stand trial.

At the Central State Hospital, with medication and treatment, Gibson's condition began to improve until he was returned to the Richmond jail with a certification that he was competent to stand trial, though there was a recommendation that medication be continued.

At the subsequent trial, the Commonwealth presented Dr. Dimitris, a psychiatrist at Central State Hospital, for the purpose of proving an incriminating statement made by Gibson. Dr. Dimitris, over objection, testified that Gibson had told him that he remembered going to his father-in-law's house and shooting his father-in-law, but Gibson claimed not to have remembered anything after that. The Commonwealth did not inquire of Dr. Dimitris about Gibson's mental or psychiatric condition while at Central State Hospital or at the time of

the slayings. Dr. Dimitris was offered solely for the purpose of proving the incriminating statement.

Later, Dr. Dimitris was called as a witness for the defense. Based upon the reports he had received and his own observations after Gibson's arrival at Central State Hospital, Dr. Dimitris expressed the opinion that Gibson had been completely out of touch with reality and was not responsible for his actions. He thought that Gibson probably was not so mentally impaired at the time of the shootings, though he could not pinpoint the onset of the complete mental breakdown that became evident at the jail. Dr. Dimitris testified that he told Gibson that Gibson had the right to refuse to talk to him about the killings, but he also told Gibson that it "would be helpful" if Gibson told him about the events, and he testified that for Gibson this "was an anxiety-generating process. It was not an easy thing to deal with." The anxiety could have stemmed in part from recollection of the events, but it was substantially based upon the examination process itself and the uncertainty about the future, for Gibson "was realizing that something was pending * * * [and that a] day in court was imminent."

The confession played a substantial part in Gibson's conviction. Coupled with the sister's testimony of Marian's protestations to "Teddy," it assured a conviction if the insanity defense did not prevail.

## II.

The problem presented here was substantially answered for us in *United States v. Albright*, 388 F.2d 719 (4th Cir. 1968). The immediate problem in *Albright* was whether a defendant in a criminal proceeding had a privilege not to be subjected to examinations by government selected psychiatrists, when the defendant himself proposed to offer some evidence to indicate that he was insane. The conclusion, of course, was that the United States may compel a defendant to submit to such an examination and evaluation, where the purpose of the prosecutor is to obtain expert witness testimony that would be indicative of the defendant's sanity. In the federal system, commitments for psychiatric examinations are specifically authorized by 18 U.S.C.A. § 4244 when the purpose is to determine a defendant's competency to stand trial. That section, however, contains an explicit prohibition against the use of any statement on the issue of guilt. When the question is not one of competency to stand trial, but the sanity of the accused at the time of the act charged in the indictment, we held that a federal court had an inherent power to order a psychiatric examination and evaluation to assist in a determination of the defendant's mental and emotional condition at the time of the commission of the act. In that situation, as in this case, there is no statutory prohibition against use of any statement made by a defendant on the issue of guilt. However, we held in *Albright* that in that situation, the Fifth Amendment privilege bars the use of an incriminating statement made to a psychiatrist for the purpose of proving a defendant's guilt.

Thus, *Albright* drew a sharp distinction between the use of the results of compulsory psychiatric examinations on the issue of sanity and the use of an incriminating statement made during a compulsory examination on the issue of guilt. The former is permissible; the latter is constitutionally forbidden. At least seven other United States Courts of Appeals have since indicated agreement with our holding that this kind of statement cannot be used on the issue of guilt. *See United States v. Bennett*, 148 U.S.App.D.C. 364, 370–372, 460 F.2d 872, 878–80 (1972); *Thornton v. Corcoran*, 132 U.S.App.D.C. 232, 236–238, 407 F.2d 695, 699–701 (1969); *United States v. Driscoll*, 399 F.2d 135, 139, 141 (2d Cir. 1968); *United States v. Alvarez*, 519 F.2d 1036, 1042 (3d Cir. 1975); *United States ex rel. Smith v. Yeager*, 451 F.2d 164, 165 (3d Cir.), *cert. denied*, 404 U.S. 859, 92 S.Ct. 112, 30 L.Ed.2d 101 (1971); *United States v. Williams*, 456 F.2d 217, 218 (5th Cir. 1972); *United States v. Bohle*, 445 F.2d 54, 66–67 (7th Cir. 1971); *United States v. Reifsteck*,

535 F.2d 1030, 1034 n. 1 (8th Cir. 1976); *United States v. Julian*, 469 F.2d 371, 375–76 (10th Cir. 1972). The same rule must apply in the state courts by force of the Fourteenth Amendment.

The rule is a sensible one. The Commonwealth and the defendant may both be in substantial need of the assistance of expert testimony on the issue of sanity. The most dependable and reliable testimony by psychiatrists would be unobtainable in many cases unless they were free to inquire into the prior aberrant conduct of the defendant, including his participation in the criminal activity with which he is charged. A person's mental condition, his motivation and his delusions would be undiscoverable in most instances unless the psychiatrist knows what the defendant has done and can engage in a penetrating discussion with the person about it. Thus, as we recognized in *Albright*, it may be necessary in some cases for the psychiatrist, in testifying on the issue of sanity, to disclose the criminal activity related to him by the defendant, but, in that event, prompt and strong cautionary instructions are required that such testimony must not be considered by the jury on the issue of guilt. Of course, no such limiting instructions was given here, for the Commonwealth presented Dr. Dimitris only on the issue of guilt and not at all on the issue of sanity.

■ It is contended that Gibson's statement to Dr. Dimitris was "voluntary," so that the Fifth Amendment privilege did not apply. It is true that Dr. Dimitris testified that before Gibson talked to him about the slayings, Dr. Dimitris had told Gibson that he had a right not to do so. But Dr. Dimitris also told Gibson that it "would be helpful if he would" talk about the slayings, and Dr. Dimitris testified that, for Gibson, the examination process was anxiety-generating and that Gibson had come out of his state of complete disorientation to the extent that "he was realizing that something was pending  *  *  *  [and that] a day in court was imminent." Dr. Dimitris did not tell Gibson that an admission by him could be used in court to convict him of murder.[1] It was not the grave consequences which might follow an admission that were emphasized; on the contrary, Dr. Dimitris suggested that it would be helpful if he spoke freely, and this at a time of great anxiety when Gibson would be expected to grasp at any straw offering a prospect of help. Dr. Dimitris, of course, was right. If he was to come up with a reliable appraisal of Gibson's mental condition, he needed to know more than he could possibly know if Gibson's lips were sealed about the events of April 10. For that very reason, we held in *Albright* that the defendant was not entitled to the presence of a lawyer during such a psychiatric examination. The lawyer's insistance that his client not talk about the crime could frustrate the very purpose of the examination. Under all of the circumstances, we cannot conclude that the statement by Dr. Dimitris, that he had a right not to answer, made Gibson's subsequent speech voluntary in the sense that it was a free and willing choice with appreciation of the possible adverse consequences.

■ Alternatively, the Commonwealth contends that Gibson waived his constitutional privilege when his attorney sought and obtained the first order for an examination and evaluation by a private psychiatrist. The causative relation between the lawyer's request and the actual examination is tenuous at best, however. It was Dr. Mullaney who determined that a commitment of Gibson to the Central State Hospital was necessary for Gibson's care and treatment. The court's order that Gibson be examined and evaluated while there may have had some unknown relation to defense counsel's earlier request for private psychiatric examination, but the examination would have been requisite quite without regard to the earlier request. Under the circumstances presented, the Commonwealth's attorney or the court itself was

---

1. We do not mean to imply that if a defendant were given a full *Miranda* warning, an incriminating statement made by the defendant during the ensuing psychiatric examination could be used at trial to prove the defendant's guilt.

**80**

obligated to have Gibson admitted for an examination into his competence to stand trial, whether the defense counsel had requested one or not. *See Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Kibert v. Peyton,* 383 F.2d 566 (4th Cir. 1967). Otherwise the Commonwealth could not even have proceeded to trial.

█ Moreover, defense counsel had no other choice than to request an examination. His client was in obvious need of psychiatric examination and psychiatric treatment. Defense counsel would have been subject to censure if he had not done what he did. Exercise of his client's right to a competency determination to prove that he was insane at the time of the act cannot be conditioned upon a waiver of his constitutional privilege against self-incrimination. In a quite similar situation, the Supreme Court held that a defendant's testimony to establish his standing to object to an unconstitutional search could not be used against him during the trial to prove his guilt. *Simmons v. United States,* 390 U.S. 377, 389–93, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

A similar situation involving a state court trial was presented in *Collins v. Auger,* 428 F.Supp. 1079 (S.D.Iowa 1977). The court held that, as a matter of fundamental fairness required by the Fourteenth Amendment, an incriminating statement made during a psychiatric examination cannot be used to prove a defendant's guilt, whether the defendant or the prosecutor requested the examination and whether it was had for the purpose of determining competence to stand trial or sanity. We reach the same result, but on the ground of the privilege against self-incrimination.

### III.

The trial judge refused to submit the question of insanity to the jury, and Gibson claims that this amounted to a directed verdict on a factual issue in violation of the Sixth and Fourteenth Amendments. We do not address that question, for Gibson must be either released or retried, and, if retried, the testimony may differ substantially from that taken at the first trial.

### IV.

For the reasons stated in Part II, the judgment is reversed and the case remanded to the district court with instructions to issue the writ of habeas corpus, if the Commonwealth does not elect to retry Gibson within a reasonable time.

*REVERSED AND REMANDED.*