**Donald Lee NOGGLE,
Petitioner-Appellee,**

v.

**Ronald C. MARSHALL, Supt.,
Respondent-Appellant.**

**No. 81–3382.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 20, 1983.

Decided May 5, 1983.

Rehearing and Rehearing En Banc
Denied June 30, 1983.

George Clifton Edwards, Jr., Chief Judge, dissented and filed opinion.

Elizabeth Manton, Asst. Public Defender (argued), Columbus, Ohio, for petitioner-appellee.

J. Anthony Logan, Rita Eppler (argued), Asst. Attys. Gen., Columbus, Ohio, for respondent-appellant.

Before EDWARDS, Chief Judge, and KENNEDY and NIES,* Circuit Judges.

NIES, Circuit Judge.

In this appeal, we review the grant of a writ of habeas corpus under 28 U.S.C. § 2254 by the United States District Court for the Southern District of Ohio, Western Division. Our jurisdiction is found in 28 U.S.C. § 2253.

Petitioner, Donald Lee Noggle, was found guilty in the Court of Common Pleas of Crawford County, Ohio, of the murder of Lawrence Grauer. The petition raises issues concerning the admissibility of testimony of psychiatric experts over the objection of petitioner. Petitioner called two experts who testified that assuming petitioner committed the act, he was insane at that time. Upon cross-examination, the state was allowed to elicit from these witnesses petitioner's statements to them concerning his participation in the death of Mr. Grauer. The state was also permitted to call, as its rebuttal witness, a psychiatrist who interviewed petitioner at the behest of petitioner's counsel but who had not been

* The Honorable Helen W. Nies, United States Court of Appeals for the Federal Circuit, sitting by designation.

called as a defense witness. This expert recounted petitioner's similar statements to him concerning the death of Mr. Grauer and testified that, in his opinion, petitioner was not mentally ill at the ·time of the alleged crime. On appeal the trial court's rulings on these matters were upheld and the judgment of conviction affirmed.

■ Noggle's petition is based on violation of his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel, as extended to the states by the Fourteenth Amendment. The District Court found no merit in petitioner's assertion that the medical experts' testimony revealing his incriminating statements to them violated his Fifth Amendment right against compulsory self-incrimination, or, with respect to those experts he put on the witness stand, his Sixth Amendment right to counsel. *Noggle v. Jago,* No. C–1–79–209 (S.D.Ohio May 26, 1981).[1] We agree. The court granted the writ, and ordered a retrial, solely upon a finding that an attorney-client privilege under the Sixth Amendment prohibited the State from calling as its witness the third medical expert consulted by petitioner. While the District Court's view that psychiatric experts retained by the defense are shielded by the attorney-client privilege has been adopted in federal criminal proceedings and in the majority of states, we do not agree that the rule articulated by the District Court is constitutionally mandated. Accordingly, we *reverse.*

## I

Petitioner-appellee Noggle was indicted by the September-November 1977 session of the Crawford County (Ohio) Grand Jury on two counts of aggravated murder, with the specification that the offense was committed while the accused was committing or attempting to commit aggravated robbery or aggravated burglary. On February 24, 1978, a jury found him guilty of one count of aggravated murder with the above speci-

fication. Noggle was, thereafter, sentenced to a term of life imprisonment, the trial court finding the mitigating factor of "mental deficiency." Our disposition of the case necessitates outlining the trial proceedings in some detail.

Lawrence Grauer was the victim of an assault on July 21, 1977. He received numerous stab wounds, which caused his death. Noggle, who was at that time 17 years old, and two others were alleged to have committed the offense. Noggle was ordered transferred to the Ohio Youth Commission .for examination. As a result of that examination and subsequent hearings, it was determined that Noggle be tried as an adult, whereupon Noggle was indicted. Following his indictment, Noggle entered pleas of not guilty and not guilty by reason of insanity.

The principal witness during the prosecution's case-in-chief was Alvin Lee Morgan, who testified concerning his own involvement in the crime and implicated Noggle. Morgan related the chronology of events that occurred leading to the killing of Lawrence Grauer. He testified that on the evening of July 21, 1977, he and Donald Noggle and another person, Virgil Thurlman, had gone to Mr. Grauer's home (where they had done some yard work that day) in search of money to purchase alcoholic beverages. He testified that Noggle looked in the window of Mr. Grauer's residence, saw him in front of the television set, and entered the house while the other two waited outside. While Morgan was watching through the window, he saw Noggle hold Mr. Grauer by the throat and swing wildly at him with a bowie knife. Morgan and Thurlman then entered the house, and the three of them turned the victim over and took money from his pockets. Noggle also stabbed Mr. Grauer's dog. The three then proceeded to a reservoir to get rid of the knife.

In addition to Morgan's testimony of the incident, the State introduced into evidence

---

1. In the petition filed with the District Court, Arnold R. Jago, then superintendent of the facility where Noggle is confined, was named as respondent. As current superintendent, Marshall has been substituted as respondent-appellant.

a plaster cast of a footprint from the scene, which matched the print from Noggle's left tennis shoe. Further evidence against Noggle was provided by the testimony of Philip Lenthold, who had been undergoing diagnostic testing at the Ohio Youth Commission at the same time as Noggle. He testified that Noggle told him he had killed a man.

Prior to trial, defense counsel had Noggle examined by three medical experts in connection with entering an insanity defense. Upon the advice and instruction of counsel, Noggle refused to cooperate with an independent expert appointed for the benefit of the court. The record provided to this court does not clearly disclose that the State also sought to compel another psychiatric examination specifically for the purpose of proof of sanity by the prosecution. In a recorded bench conference, the prosecution did refer to "the refusal of the defendant to cooperate whatsoever with not only the court's personnel but also the State."

During presentation of the defense, Noggle offered no evidence to contradict the statements made by Morgan or to disassociate himself from the events leading to the death of Mr. Grauer. The defense witnesses consisted of friends and family who described Noggle's general character. His father testified Noggle told him he thought he had killed the old man (Grauer).

In addition, the defense used two of the medical experts who had interviewed Noggle before trial as witnesses, Doctor Weitman, a psychologist, and Doctor Vincencio, a psychiatrist. The two doctors reported on the result of their evaluation of Noggle, detailing the family history and his "disassociative mental state" that subjected him to blank spells in high-stress situations. Both experts testified that Noggle was insane in response to the defense's hypothetical question that assumed, for the purpose of the sanity determination, that Noggle had been a participant in the stabbing. The

defense did not inquire into any statements Noggle had made to the two doctors concerning the crime.

On cross-examination, and over an objection by defense counsel of unspecified "privilege," the two doctors narrated what Noggle had related to each of them about his participation in the killing of Mr. Grauer, including his statement that he had stabbed the victim at least once.

On rebuttal, the State called the third expert consulted by the defense, Dr. Resnick. The defense objection to Dr. Resnick's testimony, as precluded by the physician-patient privilege provided under Ohio law, was overruled.[2] Dr. Resnick testified that the "defendant's own words, his description of his actions, his behavior is the most single important information in addition to the background material on which [to] base my conclusion." He narrated in detail statements made to him by Noggle during the course of his interview, including Noggle's statement that Noggle had stabbed the victim. The prosecution brought out during the testimony of this witness that a psychiatrist cannot tell the truth of such statements, Dr. Resnick stating: "There is no certain way that the psychiatrist can tell the veracity of the statements. There are two possibilities, one is the patient is consciously lying or distorting, and the other is that his own memory is impaired by, in this case, drugs or alcohol, so he does not have a clear recollection." On cross-examination defendant's counsel had Dr. Resnick repeat that the defendant had told him he had no intention of killing Mr. Grauer, and to restate that there is absolutely no way to tell whether Noggle, or any patient, was telling the truth or lying about the events.

The final State's witness was a medical expert from the State District V Forensic Center who testified that Noggle refused to participate in the court-ordered examination on advice of counsel. He testified further that his office formalized the waiver of

---

**2.** Dr. Resnick, in his testimony on cross-examination, stated that he told Noggle he was seeing him for his defense counsel "to conduct a legal evaluation. There was no illusion of physician-patient relationship."

the physician-patient privilege on a form signed by the person under examination to make the person fully aware that there was a waiver and that use of the report would be at the discretion of the court. Noggle refused to sign the form.

Following his conviction, Noggle pursued a direct appeal to the Ohio Court of Appeals, Third District, assigning as error, in so far as "privilege" is concerned, that permitting Dr. Resnick to testify as to confidential matters violated the physician-patient privilege. [No attorney-client privilege had up to that point been asserted.] The appellate court affirmed petitioner's conviction, holding that no physician-patient privilege attached to communications between petitioner and Dr. Resnick. As far as the record shows, the court, *sua sponte,* raised the issue of possible violation of an attorney-client privilege or constitutional right to effective counsel. In rejecting this alternative basis for possible exclusion of Dr. Resnick's testimony, the court provided the following analysis:

> It would appear then that there should be, as an incident to the constitutional guarantee of effective counsel, a correlative ability to obtain psychiatric diagnosis and opinion without rendering the defendant's statements to the psychiatrist automatically available to the prosecution, and this requires a limited privilege arising from the attorney-client relationship protecting such interviews.

> However the privilege should not extend beyond the boundaries necessitated by the guarantees of effective counsel. The ultimate objective of the trial is truth and if the privilege be over extended, the prosecution in turn is unfairly impeded. The defendant may refuse to say a word to the prosecuting experts or to court appointed psychiatrists thus effectively blocking any meaningful opinion as to his mental condition at the time of the offense from these sources. He presents only such psychiatric opinion, obtained by the defense as is favorable to his contention and asserts the privilege as to any others, and at the time of his trial, the burden was on the prosecution to

prove beyond a reasonable doubt the sanity of the defendant once that issue had been raised by the defense. The privilege changes from a mode of protection of the defendant's right to effectively explore all avenues of defense to an affirmative shield concealing pertinent opinion otherwise completely unavailable to the prosecution

> \* \* \* \* \* \*

> We conclude that as a result of the constitutional guarantee of effective counsel there is a limited privilege for psychiatric experts consulted by the defendant but that when he chooses to produce some but not all of the experts at trial to affirmatively establish a defense of insanity, he waives the privilege as to the other experts he does not choose to call.

*State v. Noggle,* No. 3–78–2, slip op. at 48–50 (Ohio Ct.App. Oct. 19, 1978).

Petitioner sought leave to appeal further to the Ohio Supreme Court raising the issue that it is a violation of the attorney-client privilege for the court to permit defendant's psychiatrist to be called as a witness on behalf of the State and to testify concerning damaging admissions made by defendant during pre-trial conversations conducted to advise defense counsel with respect to preparation of his defense.

Leave to appeal was denied for failure to present a substantial constitutional question. *State v. Noggle,* No. 78–1510 (Ohio Sup.Ct. Feb. 1, 1979). Petitioner has thus exhausted state remedies under Ohio law for the purpose of habeas corpus relief with respect to the issues herein discussed. *Collins v. Perini,* 594 F.2d 592 (6th Cir.1979); *Keener v. Ridenour,* 594 F.2d 581 (6th Cir. 1979).

## II

In his habeas corpus petition to the District Court petitioner asserted he was in custody of respondent in violation of the Constitution of the United States on two grounds. The first concerns proof of the alleged acts of the crime itself and asserts

the privilege against self-incrimination, guaranteed by the Fifth Amendment. Petitioner's rights were violated, it is argued, when the trial court allowed statements made by petitioner during the three examinations by the doctors concerning his participation in the crime, to be disclosed to the jury by the doctors who conducted the examinations. The District Court rejected this contention.

The second is directed to proof of the issue of his sanity as well as to proof of commission of the alleged offense. Noggle argues that his right to effective assistance of counsel guaranteed by the Sixth Amendment was violated when the State was allowed to call Dr. Resnick, a psychiatrist consulted by the defense, as a rebuttal witness, and to bring out his incriminating statements made to Dr. Resnick. The District Court agreed. The appeal taken for the State is based on this ruling and we will address it first.

### III

In finding Dr. Resnick's entire testimony to be a violation of the Sixth Amendment guarantee of right to counsel, the District Court found precedent in *United States v. Alvarez,* 519 F.2d 1036 (3rd Cir.1975), stating:

> The *Alvarez* court recognized that the attorney client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report is to put in usable form information obtained from the client, citing *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961), *c.f.; Federal Trade Commission v. TRW, Inc.,* 628 F.2d 207 (D.C.Cir.1980); *United States v. Cote,* 456 F.2d 142, 144 (8th Cir.1972); *United States v. Judson,* 322 F.2d 460 (9th Cir. 1963).

Slip op. at 4.

The rationale stated in *Alvarez* and found persuasive by the District Court is the following:

We see no distinction between the need of defense counsel for expert assistance in accounting matters and the same need in matters of psychiatry. The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting. If the expert is later used as a witness on behalf of the defendant, obviously the cloak of privilege ends. But when, as here, the defendant does not call the expert[,] the same privilege applies with respect to communications from the defendant as applies to such communications to the attorney himself.

519 F.2d at 1047 (footnote omitted).

From *Alvarez,* the District Court in the instant case read a broad attorney-client privilege into the Sixth Amendment requirement of effective counsel,[3] which attaches to the testimony or report of any psychiatric expert retained by the defense and which is waived only by calling that particular expert as a defense witness. Applying that premise to this case, the District Court held that there was a violation of constitutional rights occasioned simply by allowing Dr. Resnick to testify, regardless of the substance of his testimony.

### IV

We agree with the District Court that the calling of Dr. Resnick as a State's witness raises a difficult question under the Sixth Amendment. However, we do not so readily find in *Alvarez* the answer to the legal issue raised by the petition. *Alvarez* was directed to interpretation of a federal statute on a direct federal criminal appeal. While some of the language of the opinion has constitutional overtones, nevertheless, *Alvarez* was not concerned with defining the scope of constitutional guarantees. Regardless of the merit and appeal in the Third Circuit analysis of the issue before it, we have the more difficult task of discerning minimum constitutional standards in an

---

**3.** In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence. U.S. Const.Amend. VI.

area in which few appellate courts have spoken and the Supreme Court has provided little guidance. Contrary to the District Court, we conclude that the guarantee of effective counsel does not insulate from disclosure, on the issue of a defendant's sanity, the opinion of a medical expert who was retained by the defense as a potential witness.

While the rule adopted by Ohio may not be as protective of the defendant as that in *Alvarez* and other jurisdictions,[4] Ohio does not stand alone in rejecting that an attorney-psychiatric-client privilege is mandated by effective counsel requirements.

In Texas, no attorney-client privilege attaches to communications between a defendant and a psychiatrist who makes an examination with respect to sanity. By law, such experts are designated as "disinterested" and may be subpoenaed by either party to testify on that issue. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

In New York, the Court of Appeals has held that the attorney-client privilege does not encompass the disclosures to a psychiatrist whom defense counsel secured in connection with trial preparation. Moreover, a *plea* of innocence by reason of insanity has been stated to constitute, in New York, a complete and effective waiver by the defendant of any claim of privilege, patient-physician as well as attorney-client, respecting psychiatric evaluations. *People v. Edney*, 385 N.Y.S.2d 23, 26, 39 N.Y.2d 620, 625, 350 N.E.2d 400, 403 (1976).

Both the Texas and the New York rules, which appear no more favorable to the defendant than the rule applied by Ohio, have weathered an attack in habeas corpus challenges identical to that made here by Noggle. *Granviel v. Estelle*, 655 F.2d 673 (5th Cir.1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *Edney v. Smith*, 425 F.Supp. 1038 (E.D.N.Y.1976), *aff'd without opinion*, 556 F.2d 556 (2d Cir. 1977). In *Edney v. Smith*, Judge Weinstein concluded:

> We can only speculate that the New York rule results in substantial prejudice to criminal defendants.
>
> The statements by the defendant to this psychiatrist were not admitted to establish the fact of his having committed the murder, but only to establish a basis for the psychiatrist's evaluation of petitioner's sanity at the time of the offense. Given this limited use, any possible prejudice may be balanced, within limits not exceeded in this case, by the strong counterbalancing interest of the State in accurate fact-finding by its courts.
>
> In sum, it seems undesirable at this time to canonize the majority rule on the attorney-psychiatrist-client privilege and freeze it into a constitutional form not amenable to change by rule, statute, or further case-law development. Were we to force the State into the rigid format suggested by the petitioner in this case by deciding that New York must, as a constitutional matter, extend privileged status to these communications, we would cut off further experimentation in this area—not only by this State, but by all state and federal courts and legislatures. We cannot say what the ultimate consensus, if any, will be on these policy issues. But it appears inappropriate and unwise at this stage to block potential branches of evolution.
>
> Courts and legislatures must be given reasonable freedom to develop new approaches to questions of testimonial privilege. This subject is currently in a state of development, with increasing pressures for the creation of entirely new privileges, such as the social worker-client and reporter-source, and the expansion of older privileges predicated upon expanding

---

4. *See, e.g., State v. Pratt*, 284 Md. 516, 398 A.2d 421 (Ct.App.1979); *Pouncy v. State*, 353 So.2d 640 (Fla.App.1977); *People v. Knippenberg*, 66 Ill.2d 276, 6 Ill.Dec. 46, 362 N.E.2d 681 (1977); *People v. Hilliker*, 29 Mich.App. 543, 185 N.W.2d 831 (1971); *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957); *San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951).

concepts of privacy. At the same time there is continued counter-pressure from the compelling interest in the ascertainment of truth in the pursuit of just determinations of legal contests. *See, e.g.,* Federal Rules of Evidence, Rules 102, 401–403, 501, 803(24). For us to force one phase of the law of evidence into the procrustean bed urged by petitioner might be to disserve the arguably desirable development of more flexible rules of privilege.

425 F.Supp. at 1054–55.

In upholding the Texas rule, the habeas court in *Granviel v. Estelle,* endorsed the foregoing analysis by Judge Weinstein in *Edney v. Smith. See also State v. Dodis,* 314 N.W.2d 233 (Minn.1982), where the Minnesota Supreme Court reached a similar conclusion with respect to the constitutional issue, also relying upon *Edney v. Smith.*

We also agree with Judge Weinstein's analysis and are convinced that no single approach is mandated by the constitutional requirement for effective assistance of counsel, and the concepts of privilege which may be inherent therein.[5] In this developing area of the law, the states must be left to experiment and innovate.

Our review of decisions of the various jurisdictions discloses that such experimentation has resulted in widely diverse privilege standards as well as different standards of what constitutes waiver of the privilege and to what issues the waiver applies. Indeed, the jurisdictions vary on whether the courts should or can compel psychiatric examination; what sanctions, if any, may be imposed for failure of a defendant to cooperate; and, most fundamentally, who has the burden of proof of the underlying sanity issue. Moreover, different procedural safeguards are provided, *e.g.,* bifurcation of trial on the issues of commission of the act (in some jurisdictions referred to as a determination of "guilt") and of the issue of "sanity"; bifurcation of the determination of guilt (including sanity) and sentencing; requirements with respect to the order in which each issue is tried; requirements for different juries in bifurcated proceedings; as well as requirements for the same jury in bifurcated proceedings. The rulings on particular issues are affected by countervailing procedures or holdings. In our view, the constitutional question cannot, thus, be posed merely in terms of the scope of "the attorney-client privilege." Rather, we must focus on whether the balance drawn by Ohio was so detrimental to the attorney's effective representation of his client as to be prohibited by the Sixth Amendment.

Ohio recognizes a limited privilege, one that forecloses the use of a defense psychiatrist by the State during presentation of its case-in-chief. This privilege was waived not merely by Noggle's plea of insanity but by the defense putting medical experts on the stand who testified that he was insane. We cannot say that the Sixth Amendment requires more than the balance struck here by Ohio.[6] Thus, there is no

---

5. *See* Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists,* 66 Va.L.Rev. 597, 603–04 n. 14 (1980).

6. We also do not see any violation of the Fifth Amendment by providing a witness to the State on the issue of sanity. The adversarial nature of criminal proceedings reflected in the Fifth Amendment requires that the State obtain evidence independently from the defendant. It does not however preclude court ordered psychiatric examination. *See Estelle v. Smith,* 451 U.S. 454, 465–66, 101 S.Ct. 1866, 1874–1875, 68 L.Ed.2d 359 (1981), and cases cited therein. We discern no significant difference between the compulsion in a court-ordered examination and the subpoena of a psychiatrist who has made an evaluation for the purpose of serving as a possible defense witness. Unlike evidence relating to commission of the alleged acts, evidence of sanity or insanity can only be obtained from the defendant. *Cf., Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (identity of alibi witness must be disclosed). *See also United States v. Euge,* 444 U.S. 707, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980) (handwriting exemplar); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice exemplar); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplar); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (lineup); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood sample).

entitlement to habeas corpus relief on the basis that a violation of a constitutionally mandated attorney-psychiatrist-client privilege occurred when the state called as its witness a defense-retained psychiatrist.

## V

Noggle asserts as alternative bases for his petition that all incriminating statements to psychiatrists revealing his participation in the acts of the crime must be excluded either because of the Fifth Amendment guarantee against self-incrimination [7] or because of the Sixth Amendment guarantee of effective counsel.[8] As authority, Noggle relies on decisions from a number of jurisdictions holding that incriminating statements made in court-ordered psychiatric examinations may not be used for the purpose of proving the acts of the crime, *e.g., Gibson v. Zahradnick,* 581 F.2d 75, 76 (4th Cir.), *cert. denied,* 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *United States v. Cohen,* 530 F.2d 43, 48 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Alvarez, supra.* Moreover, in *Estelle v. Smith, supra,* the United States Supreme Court held that by submitting to a court-ordered examination to determine his competency to stand trial, the defendant was found not to have waived his objection to testimony by that medical examiner at trial with respect to the penalty to be imposed. The Court stated:

> The fact that respondent's statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment.

451 U.S. at 469, 101 S.Ct. at 1876.

Again, a court-ordered examination was involved in that case, but the above tenet, as well as the concepts of knowing waiver of Fifth Amendment rights discussed therein, cannot wholly be disregarded because we are here considering a voluntary examination.

■ We do not draw from this precedent, however, a conclusion that the scope of cross-examination of defense-called medical experts is constitutionally proscribed *per se* with respect to inculpatory statements. The State is entitled to test the validity of an expert's opinion.[9] Nevertheless, contrary to the District Court's view, we conclude that Fifth Amendment rights are relevant even after a defendant calls his own medical experts to the stand, with respect to the issue of his commission of the acts. Evidence of a defendant's inculpatory statements during a psychiatric examination cannot be admitted to prove guilt. To hold otherwise would make the privilege against self-incrimination illusory. Moreover, such evidence should not be permitted to affect the jury's determination on that issue to any greater extent than is inherent in an insanity plea which unavoidably may contain an admission that defendant did the act but under circumstances for which he is not responsible.

A bifurcated trial as in *Alvarez, supra,* clearly would effectively screen the medical testimony from being given any weight on the issue of guilt. However, a bifurcated trial is not constitutionally mandated. *See*

---

7. No person ... shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V.

8. We perceive the Fifth and Sixth Amendment privileges to be different expressions of the same concept in this context.

9. Additionally, in contrast to Fed.R.Evid. 705, Ohio requires an expert witness to disclose the underlying facts on which an opinion is based before giving that opinion:

 RULE 705. Disclosure of facts or Data Underlying Expert Opinion

 The expert may testify in terms of opinion or inference and give his reasons therefor *after disclosure of the underlying facts or data.* The disclosure may be in response to a hypothetical question or otherwise. [Emphasis added.]

Thus, it was permissible for the prosecution to have cross-examined the defense-called psychiatrist with respect to inculpatory statements made by the defendant and relied upon by that expert in formulating his opinion on the issue of the defendant's insanity. Those statements should have been disclosed on direct-examination before eliciting the opinion.

*McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). Noggle instead relies on the position taken by the court in *Gibson v. Zahradnick, supra,* that a cautionary instruction must be given to the jury immediately after such testimony is heard. Such an instruction is of debatable effectiveness, not always desired by the defendant, and clearly cannot entirely erase the testimony from the minds of the jurors. It is at best a device for balancing interests of the State and the defendant. In any event, while such an instruction may be necessary in some cases, we do not conclude that the failure of the trial judge to give an instruction, *sua sponte,* immediately following the expert's testimony was required by the guarantee under the Fifth Amendment against self-incrimination. Whether an instruction must be given is more appropriately tested by standards of due process, that is, the more nebulous test of general fairness of the trial as a whole.

█ It is apparent from a review of the proceedings detailed above that the State had done its work independently in putting forth, during its case-in-chief, a solid case establishing that Noggle killed Grauer, which was strengthened by at least one defense witness, his father. Not a shred of evidence was introduced by Noggle, or through cross-examination of the State's witnesses, to contradict the State's proof. Nor does Noggle point to anything in the record indicating that the State misused the medical experts' testimony to buttress its case on the issue of commission of the act. We do not see any prejudicial effect from the failure of the judge to instruct the jury immediately following the cross-examination testimony of the defense witnesses.

The Ohio court was not asked to address the above issues.[10] During the appeal, Noggle was, at most, attacking only the testimony of Dr. Resnick on constitutional grounds. Given that the testimony by the two defense experts included incriminating statements, the Ohio court found a waiver with respect to the similar statements made to Dr. Resnick. Since the defense experts' testimony relating to disclosures by Noggle was properly admitted, we do not see any basis on which to overturn the ruling with respect to Dr. Resnick on constitutional grounds.

## VI

The decision of the District Court is *reversed,* and the case is remanded with directions that the writ be quashed and that the order directing the State of Ohio to either retry or free Noggle be vacated.

**REVERSED AND REMANDED.**

GEORGE CLIFTON EDWARDS, Jr., Chief Judge, dissenting.

The following opinion was written as a proposed majority opinion for the panel. Unfortunately my colleagues' concern for the Sixth Amendment's right to counsel proves to be considerably less than mine. I recognize fully that this is an appeal from a District Judge's issuance of a writ of habeas corpus. So, of course, did the District Judge who issued this writ. But what was permitted here in state court was the prosecution's penetration of defense counsel's list of expert witnesses and subsequent deliberate employment under power of subpoena of crucial evidence from an expert witness chosen by defense counsel—all in order to influence the jury on the critical issue of this trial. The invasion of defendant counsel's preparation for trial and the prosecutor's deliberately making known to this jury that the prosecution's key witness had originally been chosen to examine defendant by defendant's lawyer undoubtedly had a powerful impact on the jury's verdict on the insanity issue.

The Sixth Amendment provides, "In all criminal prosecutions the accused shall . . . have the Assistance of Counsel for his defense." For the state to use against the accused his counsel's efforts in the choice of

---

10. As indicated, State remedies have, nonetheless, been exhausted, *Collins v. Perini, supra; Keener v. Ridenour, supra.*

expert witnesses is to violate the constitutional command that the "accused shall . . . have the Assistance of Counsel for his defense." Such a decision will also grossly interfere with defense counsel's willingness to obtain a range of opinions in consulting expert witnesses and will tend to limit him to witnesses whose opinions are for sale.

The prosecutor's action was clearly deliberate and clearly harmful. It was also very dirty pool.

This case involves a petition for habeas corpus, an insanity plea, and a very brutal murder. Defendant was tried on a plea of not guilty and not guilty by reason of insanity. A review of the record demonstrates that there was very substantial admissible evidence to support the jury's guilty verdict absent consideration of the insanity plea. Two psychiatrists were called by the defense. They testified that Noggle was insane when he committed the murder. They were subsequently cross-examined by the state, not on that issue, but on what Noggle had told them (the psychiatrists) about the facts of the crime. He had, in fact, confessed completely to each of them to the facts of the killing.

The serious issue in this appeal—and the one on which the District Court based his grant of the writ—pertains to the state court's handling of the psychiatric testimony of Dr. Resnick bearing on the insanity plea. The District Judge issued the writ on the basis of the prosecution's calling to the witness stand Dr. Resnick, whom Noggle's lawyer had asked to examine Noggle, who had done so but whose *adverse* testimony defendant's attorney had not introduced. As the following excerpt from the record indicates, the prosecutor made Dr. Resnick's prior association with the defense abundantly clear:

Q: *Doctor, so there's no misunderstanding, you're appearing here this morning as a result of a subpoena I issued for your appearance?*

A: *That is correct.*

Q: *And, doctor, have you had occasion to examine one Donald Noggle?*

A: *Yes, I did. . . .*

Q: *How did you happen to conduct an examination of Donald Noggle?*

A: *I received a request from the defense attorney, Mr. Paul Hoeffel.*

Q: *Doctor, is the individual that you conducted the examination on in the courtroom at this time?*

A: *Yes, he is. . . .*

Q: *I note you are referring to your notes, did you make notes during your examination?*

A: *Yes, I made notes during my examination.*

Q: *And spent some time preparing for this examination by reviewing other material?*

Q: *Yes, I did.*

Q: *What material in particular were you reviewing in reference to the defendant, Donald Noggle?*

A: *I reviewed the following specific materials—the medical psychological and psychiatric evaluation prepared by the Child Study Center in Columbus; the Clinical Psycho-diagnostic material prepared by Dr. Carl Weitman; the defendant's school transcript; his arrest records of the Bucyrus Police Department; the Pediatric-Psychiatric report of Dr. James Christopher and reports from Dr. Vocal.*

Q: *Doctor, when you conduct an initial examination what steps do you go through?*

A: *Ordinarily I would request of the referring attorney or court as complete a background as possible regarding information from the Prosecutor's file, police reports, past medical and psychiatric reports and then I interview the defendant and if I think it's indicated I may go on to suggest psychological testing.*

Q: *In the various reports you indicated you reviewed, those were provided for you by counsel?*

A: *The defense attorney did provide all of the reports that I mentioned.*

The trial judge, over vigorous objection that it was a violation of the physician-patient and attorney/client privileges for the prosecutor to call the prospective psychiat-

ric witness for the defendant, admitted the evidence before the jury.[1] *The prosecutor elicited the psychiatrist's professional conclusion [which he had previously conveyed to Noggle and his attorney] that Noggle had not been mentally ill at the time of the murder.*

Appellant in this case has been convicted of first degree murder for an offense committed at the age of 17. This record is replete with evidence that on the night in question, appellant entered the victim's home and killed him by stabbing him 30 times with a bowie knife. He also stabbed the victim's little dog to death.

After jury trial in an Ohio state court, he was found guilty and not insane. He was sentenced to life imprisonment—escaping the death penalty because the state trial judge found him to be suffering from "diminished mental capacity." After exhaustion of appellate issues in the Ohio courts, appellant filed a petition for writ of habeas corpus in the U.S. District Court for the Southern District of Ohio alleging violation of his federal constitutional rights under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. The habeas petition was heard and granted. The District Judge, in a comprehensive opinion, phrased the critical issue as follows:

Petitioner is now before this Court, through counsel, alleging he is in custody of respondent in violation of the Constitution of the United States in that:

\*　　\*　　\*　　\*　　\*　　\*

2. His right to effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, was violated when the state was allowed to call Dr. Resnick, a psychiatrist consulted by the defense, as a rebuttal witness and question him as to statements made to him by petitioner during the course of his evaluation of the petitioner concerning petitioner's participation in the crime.[2]

The District Judge recited the facts directly relevant to this issue as follows:

At trial, the state's evidence consisted of a plaster cast of a footprint from the scene of the crime which matched a print from one of petitioner's left tennis shoes, the testimony of Alvin Leon Morgan which implicated himself, petitioner, and one other as the perpetrators of the crime, and the testimony of Phillip Leuthold, which consisted of relating incriminating statements petitioner made to him while both were undergoing diagnostic testing by the Ohio Youth Commission.

During the presentation of the defense, counsel called Drs. Weitman and Vincencio as medical experts to testify on the issue of petitioner's sanity. Both gave opinions, based on hypothetical questions assuming petitioner's guilt, that petitioner was insane at the time of the act. On cross examination, counsel for the state asked both doctors to relate what petitioner had told them, during the course of their examinations, regarding his participation in the crime. Defense counsel objected strenuously when Dr. Weitman, the first medical expert to testify, was asked this question, and when

---

1. The initial colloquy between defense counsel and the trial court over the admissibility of Dr. Resnick's testimony reads as follows:

 MR. WAGNER: Please the Court, we would object to Dr. Resnick being called as a witness for the State and would like to argue the objection out of the presence of the jury.
 THE COURT: The jury will return to the jury room—remember the admonition of the court not to discuss this case.
 THEREUPON, the jury left the courtroom and the following proceedings took place:
 MR. WAGNER: This witness, Dr. Phillip Resnick, is and has been employed by the defendant in this cause, the objection is the physician-patient confidentiality; secondly,

we respectfully submit that this doctor's testimony and his report is part of the work product of the defense and it would be highly prejudicial to the rights of the defendant for him to give testimony at this time as a witness on direct examination for the State of Ohio.

2. The petitioner has also raised a Fifth Amendment claim, based upon the psychiatrist's testimony revealing admissions of Noggle on the issue of his commission of the criminal act. Because I would dispose of this case on Sixth Amendment grounds, I would not reach petitioner's Fifth Amendment claim.

the trial court overruled his objection, defense counsel asked for, and received, a continuing objection to those questions. Defense counsel made no objection when the same questions were asked of Dr. Vincencio.

In rebuttal, the state called Dr. Resnick. Defense counsel again objected, first when he was called on the basis that Dr. Resnick had been employed by the defense, and again when the prosecution asked Dr. Resnick what petitioner had told him regarding the incidents surrounding Mr. Grauer's death. Both of these objections were also overruled. Dr. Resnick testified, as did the other experts, as to statements made to him by petitioner concerning his participation in the crime. He further testified that it was his opinion that petitioner was free of mental illness at the time of the incident.

The major part of the defense evidence centered on Noggle's insanity plea. The defense called Noggle's parents, teachers, and doctors in an effort to demonstrate that Noggle could not understand or control his acts on the night of the crime.

Donald Noggle grew up in a chaotic and violent atmosphere. His parents divorced when he was a year old, remarried, and then divorced again when he was 12. His mother abandoned the family when he was 9 and turned up a week later in a local jail. Moreover, Noggle's mother, and on occasion his natural father, had severe drinking problems. For example, his mother testified that she and Robert Noggle would each drink 20 bottles of beer and proceed to fight, breaking the furniture in the house and on three occasions, her nose. His mother testified that she could not control her son's behavior and that often he would stay out late at night for long periods of time.

One of Donald Noggle's responses to this environment was withdrawal. To illustrate, the defense was able to call six witnesses who testified that Noggle had never exhibited any propensity for violence. The witnesses included his father, his mother, his stepfather, his employer, his juvenile probation officer, and his teacher. Both his father and his stepfather testified that

Noggle was afraid of fights and would avoid them whenever possible. James Grady, his teacher, also testified that he had never seen Noggle exhibit any propensity for violence and that Noggle had never shown the aggressiveness needed to commit the murder.

There was also testimony concerning drug use. Noggle told one expert that he started using drugs at age 12. And, he was arrested for possession of marijuana in December 1976. His mother added that she knew he was using marijuana from 1973 or 1974 onwards. Moreover, Noggle's juvenile probation officer offered the opinion that Noggle experimented with marijuana "with some consistency."

On July 20, 1977, the night before the murder, Mrs. Noggle returned home from work in a "pretty intoxicated" state. After seeing Noggle sleeping on the couch with his clothes on, she went into the kitchen and tried to slit her wrists. Noggle woke up, also went into the kitchen and prevented her from doing this. Then, she told Noggle that she would wait for her husband to come home from work and that she would then go to an alcoholic treatment center in Tiffin, Ohio. Noggle strongly disagreed with this decision. When his stepfather and his family took her to the center the next morning, he remained at home, cursed at her, and told her that he never wanted to see her again. He also refused to visit her during the week she was at the treatment center.

Both the doctors who testified on behalf of Noggle relied partially on his family background. Each of them mentioned his resulting tremendous repression of feelings, and his dissociative mental state that subjected him to blank spells in high stress situations. Dr. Weitman characterized Noggle as a "timebomb", who quite plausibly was "robot-like" on the night of the murder. Dr. Vincencio used the comparable term "sleep-walker" to describe Noggle's dissociative state. The psychiatric evidence furnished by the defense shows the importance of Dr. Resnick's testimony and indicates reason for my belief that its ad-

mission could not be termed "harmless error".

I believe that the state prosecutor's calling of Dr. Resnick and the eliciting of his professional opinion upon the question of Noggle's insanity was an invasion of Noggle's Sixth Amendment right to counsel of such magnitude as to warrant the District Judge's issuance of the writ. Such a procedure offends two basic tenets of the Sixth Amendment. First, the right to counsel secured by that Amendment contemplates the right to effective assistance of counsel. *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038, 1048 (E.D.N.Y.1976), *aff'd,* 556 F.2d 556 (2d Cir.), *cert. denied,* 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977) [citing *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970)]. In *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975), the U.S. Court of Appeals for the Third Circuit expounded on the implications of "effective Assistance of Counsel" in the context of the insanity defense as follows:

> The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting. If the expert is later used as a witness on behalf of the defendant, obviously the cloak of privilege ends. But when, as here, the defendant does not call the expert the same privilege applies with respect to communications from the defendant as applies to such communications to the attorney himself.
>
> The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the

attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness.

> The attorney should not be inhibited from consulting one or more experts, with possibly conflicting views, by the fear that in doing so he may be assisting the government in meeting its burden of proof on the [*United States v.*] *Currens* [290 F.2d 751 (3d Cir.1961)] issue. Thus we reject the contention that the assertion of insanity at the time of the offense waives the attorney-client privilege with respect to psychiatric consultations made in preparation for trial.

*Id.* at 1046–47.

In an analogous context, the U.S. District Court for the Northern District of California adopted the *Alvarez* approach, observing that, "Any other rule would mean that a defendant contemplating a psychiatric defense must run the risk that a psychiatrist he hired to advise him with respect to this mental state would be forced to be a government witness." *United States v. Layton,* 90 F.R.D. 520, 525 (N.D.Cal.1981).

Secondly, permitting Dr. Resnick to testify runs counter to the notion that the invocation of the right to counsel marks the beginning of formal adversarial proceedings. From that point forward, maintenance of a fair individual-state balance demands that the state prove its case by resort to resources other than the defendant. Several Sixth Amendment interrogation cases demonstrate the point. For example, in *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977), the Supreme Court observed that, "This right guaranteed by the Sixth and Fourteenth Amendments, is indispensable to the fair administration of our adversary system of criminal justice." Similarly, in *Escobedo v. Illinois,* 378 U.S. 478, 492, 84 S.Ct. 1758,

1766, 12 L.Ed.2d 977 (1964), the Supreme Court held that "when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." In one of its more expansive and eloquent analyses of the importance of resisting incursions on the operation of an adversarial criminal justice system, the Supreme Court noted that:

> Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from the practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end.... Under our system society carries the burden of proving its charges against the accused not out of his own mouth. It must establish its case ... by *evidence independently secured through skillful investigation.* 'The law will not suffer a prisoner to be the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed. 1824)." (Emphasis added).

*Watts v. Indiana,* 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949).[3]

The principle underlying the Sixth Amendment interrogation cases—maintenance of the adversarial system—applies with equal force to the Sixth Amendment interest implicated in this case. The integrity of that system prohibits the state from interfering with the defense effort of an accused by becoming reliant upon the defendant's statements to prove the case against him. Similarly, the integrity of that system is offended by state interference with the defense effort by becoming reliant upon the defendant's expert in order to establish sanity beyond a reasonable doubt. In either event, the requirement that the state be put to its proof by "evidence independently secured" has been contravened.

In addition to the difficulties raised by Dr. Resnick's testimony, his appearance on the stand at the behest of the state interferes with the other Sixth Amendment concern articulated above—the assurance of effective assistance of counsel. It is clear on this record that Noggle agreed to Dr. Resnick's examination on the advice of his counsel and that he talked freely with this psychiatrist under that circumstance. There is no indication in this record that he was ever warned that the evidence he was giving could be used against him but it may have been Dr. Resnick's evidence, in particular his opinion that Noggle was sane at the time of the murder which persuaded the jury. *Two medical opinions, of course, may be overborn in the minds of the jurors by one which they consider better reasoned, but Dr. Resnick's opinion on the only critical issue in the case sounded with a totally impermissible authority. Indeed, the jury was told that he had been chosen by Noggle's own attorney to supply a professional opinion but had been produced by the state when that opinion did not accord with the defendant's interest.*

*The Sixth Amendment right to counsel must encompass counsel's ability to seek expert opinion in the difficult area of psychiatry without playing Russian roulette with his client's insanity plea in the event someone he chooses for an examination provides an opportunity which the prosecutor would like to exploit.*

Two other issues are argued by the state to counter the objectionable character of this obvious invasion of the defendant's right to full assistance of counsel. In the first of these, the state argues that the defendant waived any right to object to Dr. Resnick's testimony by introducing psychiatric testimony of two other doctors. There is, however, no specific waiver in this record, either by Noggle or his lawyer, as to Dr. Resnick's testimony. On the contrary,

---

3. Although *Watts* was decided on due process grounds prior to the incorporation of the Fifth and Sixth Amendment to the states through the Fourteenth Amendment, it rests factually on a confession produced by extended interrogation in the absence of counsel. It thus can be viewed as residing where the Fifth Amendment shades imperceptibly into the Sixth.

Noggle's counsel objected vigorously. For the reasons set forth above, no waiver should be implied.

The state's second argument is that even if Dr. Resnick's testimony did constitute an invasion of Noggle's Sixth Amendment rights and even if this invasion was not waived, the testimony by Dr. Resnick that, in his opinion, Noggle was not insane, should be admitted because there would then be no other way for the state's case to be presented.

This argument, however, ignores the existence of the procedure carefully spelled out in Rule 12.2, Federal Rules of Criminal Procedure. This rule reads in applicable part:

> **(c) Psychiatric Examination.** In an appropriate case the court may, upon motion of the attorney for the government, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the accused in the course of any examination provided for by this rule, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.
>
> **(d) Failure to Comply.** If there is a failure to … submit to an examination when ordered under subdivision (c) of this rule, the court may exclude the testimony of any expert witness offered by the defendant on the issue of his mental state.

This federal rule is clearly not applicable to this state trial, but it could have been employed by the state trial judge when he found himself confronted with the situation as described above. Under the federal rule, Noggle would have had to choose as to whether or not he would submit himself to examination by a state psychiatrist (which in fact he refused to do)[4] or be prohibited from submitting psychiatric evidence to support his claim of mental illness. *See, e.g., United States v. Campbell,* 675 F.2d 815, 820 (6th Cir.1982); *Cf. United States v. Handy,* 454 F.2d 885, 888 (9th Cir.1972), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972) (authorizing trial court, prior to the adoption of Rule 12.2, to condition admission of defense expert testimony on defendant's submission to a psychiatric examination by a state expert). There is no reason why the trial judge could not, by his rulings, have followed the spirit and purpose of this rule, which is clearly designed to be fair both to the prosecutor and the defendant. *But see, Granviel v. Estelle,* 655 F.2d 673, 679–83 (5th Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038 (E.D.N.Y.1976), *aff'd,* 556 F.2d 556 (2d Cir.1977), *cert. denied,* 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977).[5]

In the alternative, the trial judge could have ruled that the government could not call and cross-examine a psychiatrist chosen by defendant's counsel, but could, as he did,

---

**4.** Noggle's refusal to submit to an examination by a State psychiatrist should not prejudice his case, since in this instance, the State sought to overreach by requiring Noggle to sign a Fifth Amendment waiver as a precondition to such an examination. Under these circumstances, defense counsel's reticence is understandable, and his choice to refuse the examination should not preclude admission of defense psychiatric testimony.

**5.** I disagree with *Granviel* and *Smith* for two reasons. Firstly, I believe that the effectiveness of defense counsel is substantially eroded once the jury learns of the prior defense association of a psychiatrist who ultimately testifies for the State. In *Smith,* Judge Weinstein in fact acknowledged that the communication of such a link results in substantial prejudice to

the defendant, 425 F.Supp. at 1053. Although he suggested that the difficulty could be remedied by excluding information about nexus, such a proposal cannot be applied in this case. The prosecutor in this instance has graphically underscored the prior defense association of Dr. Resnick.

Secondly, I take issue with *Granviel* and *Smith* because neither case has, in my opinion, taken sufficient account of the incursion on the adversarial system attributable to permitting defense experts to testify for the State on the issue of insanity. I reiterate that the procedure utilized in this case contravenes the Sixth Amendment requirement that the State be put to its proof by "evidence independently secured."

hold that they could cross-examine the witnesses called by the defendant, and further could employ a psychiatrist to sit in the courtroom during the psychiatric evidence and subsequently testify in relation to hypothetical questions concerning his opinions as to whether or not Noggle was sane at the time. Either of these procedures would have been infinitely closer than what was done in this case to complying with the right to counsel imbedded in the Sixth Amendment.

Accordingly, I respectfully dissent.