IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 7, 1999, Session

## STATE OF TENNESSEE v. RONALD WEEKS, SR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-12318   James C. Beasley, Jr., Judge**

_____

**No. W1998-00022-CCA-R3-CD - Decided October 2, 2000**

_____

The defendant, Ronald Weeks, Sr., was convicted of aggravated sexual battery and sentenced to eight years in the Shelby County workhouse. In this appeal of right, the defendant asserts that the trial court erred by allowing the state to introduce two post-arrest statements allegedly taken in violation of his constitutional right against self-incrimination. The defendant also contends that the trial court erred by denying his motions for judgment of acquittal; by applying Tenn. Code Ann. § 40-35-114(15) (abuse of a position of public or private trust) to enhance his sentence; and by failing to sentence him as an especially mitigated offender. We hold that the trial court correctly applied Tenn. Code Ann. § 40-35-114(15) to enhance the defendant's sentence and properly found that the defendant was not eligible for sentencing as an especially mitigated offender. Because we conclude, however, that the defendant's post-arrest statements should have been suppressed as violative of the defendant's right against self-incrimination, we reverse the judgment of the trial court and remand this cause for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Reversed.**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. NORMA MCGEE OGLE, J., filed a dissenting opinion.

James V. Ball and Barry W. Kuhn, Memphis, Tennessee, for the appellant, Ronald Weeks, Sr.

Paul G. Summers, Attorney General & Reporter, R. Stephen Jobe, Assistant Attorney General, and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On July 24, 1997, the defendant, who is deaf, invited the victim,[1] who was five years old, into his home. According to pretrial statements the defendant made to the police, the defendant and the victim played with the defendant's pets and talked about Disney World. At some point, the defendant removed his and the victim's shorts and underwear, laid on top of the victim, and rubbed

_____

[1]It is the policy of this court not to reveal the name of a minor who has been the victim of a sex crime.

his body on the victim's body until he ejaculated. The defendant then cleaned the victim and sent her home. Immediately afterwards, the defendant felt guilty and walked next door to the victim's home to apologize to the victim's mother.

When the victim's mother answered the doorbell, the defendant was on the front porch wearing only red satin-type boxer shorts. The defendant, who appeared to be distraught, apologized and explained that he did not know what he was doing. The victim's mother, who was completely unaware of the events, assumed that the victim had been bitten by one of the defendant's pets and assured the defendant that everything would be fine.

Later, when the victim's mother asked what had occurred, the victim explained that the defendant had taken off her shorts, laid on top of her, and "peed" on her. A subsequent analysis of the victim's underwear indicated the presence of semen. Vaginal swabs, performed in a medical examination of the victim, did not reveal the presence of semen.

The victim's mother reported the incident and David Jones, a detective with the Bartlett Police Department, made the arrest. At trial, Detective Jones testified that he went to the defendant's home and advised the defendant that he was being arrested for sexual assault. Through whispering and body language, the defendant asked for the detective to "hold on." Detective Jones walked inside the residence while the defendant got his shoes. Detective Jones believed that the defendant understood what was happening.

Although an interpreter had been requested, none was present when the defendant reached the police station. The defendant was placed in a holding cell and nearly four hours later, the interpreter arrived. At that point, Detective Jones read the defendant his Miranda rights and proceeded to take two statements from the defendant: the first in the form of an oral statement that was recorded and transcribed; and the second in the form of handwritten responses by the defendant to a standard questionnaire.

An indictment was returned against the defendant in November of 1997. The defendant entered a plea of not guilty. In January of 1998, the defendant filed a motion to suppress the statements he had made to the police. After a hearing on the motion in March, the trial court took the matter under advisement. On April 30, 1998, the trial court ruled that the confessions were admissible. Three months later, the defendant filed notice of an insanity defense. At the outset of the trial, the defendant entered a not guilty plea and reserved making an opening statement.

At trial, the victim was called as the state's first witness. While able to respond to many of the questions submitted by the assistant district attorney general, the victim could provide little information about the offense. When asked, "Can you tell me what [the defendant] did," the victim did not respond. Even though the trial court allowed the state to ask leading questions, the victim would not answer several critical questions, such as "did you ever have your shorts off," "[d]id you see Mr. Ronnie naked that day," "[c]an you tell us what you told your mama," and "[w]hat did [the defendant] do that made you go see a nurse." There was no response at all to many questions. The

record establishes that there were several delays in the proceedings designed to allow the victim an opportunity to gain her composure and describe the events at issue. The victim could only characterize her experience as "bad." The mother of the victim, however, was allowed to testify as to what the victim told her about the incident shortly after its occurrence.

At the conclusion of the state's proof, the defendant again asked that his statements be suppressed. He also sought a judgment of acquittal. The trial court denied each request. Thereafter, the defense presented was one of insanity due to a diagnosis of severe depression.

The defendant's wife of 25 years, Vicki Weeks, testified that the defendant had worked as a mail handler for the postal service for 24 years. Ms. Weeks testified that the defendant became despondent in July of 1997, only a short time before the assault on the victim, due to financial problems, and that he had curtailed many of his activities, especially tennis. She recalled that he slept excessively. After his arrest, the defendant sought counseling and was prescribed medication.

Mae Weeks, the defendant's mother, testified that the defendant was born prematurely, after only a six-and-one-half-month pregnancy, and was deaf, able to hear only high-pitched sounds. She recalled that despite his impairment, however, the defendant became "the leader in his class" in hearing school and later excelled as a tennis player. Ms. Weeks testified that just prior to the offense, the defendant had undergone changes in his personality, becoming "withdrawn," "haggard," and "unkempt."

Ronald Weeks, Jr., the twenty-four-year-old only child of the defendant and his wife, testified that he noticed a change in his father's personality during the year before the trial. He stated that the defendant had become "very quiet, reserved," and described him as "extremely, extremely depressed."

John Ciocca, a clinical psychologist, treated the defendant. After a series of tests, he diagnosed the defendant as severely depressed with a co-existing "paranoid delusional disorder in which he suffered from the inability to tell reality from fantasy . . . and in which his ability to govern his behavior would be impaired." Dr. Ciocca testified that the defendant, during interviews, provided the details of the incident involving the victim. He characterized the defendant's statement as "a rather disturbing story . . . [and] an example of a horrible thing that [the defendant did] to a little girl . . . ." Dr. Ciocca described the defendant as "in a process of psychological decline since early in 1997–increasing irritability, increasing hostility, increasing agitation, sleeplessness, [and] difficulty with overreacting to people and things." He asserted that this mental disease or defect was "severe," resulting in a loss of contact with reality. Dr. Ciocca administered psychological testing to the defendant in the form of the Millon Inventory testing and the Minnesota Multi-phasic Personality Inventory. It was Dr. Ciocca's conclusion that the defendant "was unable to appreciate the nature and wrongfulness of the event at the time it occurred." It was his opinion that the defendant had a psychotic episode which lasted no more than "several hours." Dr. Ciocca testified that the defendant's apology to the victim's mother shortly after the occurrence at issue was not inconsistent with his diagnosis.

The state cross-examined Dr. Ciocca extensively, directing particular attention to the defendant's pretrial statements:

> Q. Did you receive . . . [t]he defendant's statements in this case–the confession?
>
> A. Yes.
>
> Q. And you read the entire confession. Is that right?
>
> A. That's correct.

The state then asked specifically about a separate incident that the trial court had previously redacted from the confession, wherein the defendant acknowledged to police that "an incident[] almost took place with another child" but did not "because he realized what he was doing was wrong."

After the defense rested its case, the state called Kenneth Fulmar, a tennis league manager, as a witness. Fulmar stated that the defendant won first place in a tennis tournament that began in April of 1997 and extended through mid-June of that year. Bob Jackson, a postal service record keeper, was called by the state to confirm that the defendant received an "above average" evaluation for his job performance between May and July of 1997.

Dr. John Whirley, a clinical psychologist, performed a court-ordered evaluation of the defendant some two months prior to trial. Dr. Whirley concluded after a relatively short interview that the defendant was competent to stand trial and that a defense of insanity could not be supported. In making his assessment, Dr. Whirley "reviewed the written statements given [by the defendant] to the Bartlett Police [and] the transcript of the interview with the Bartlett Police." Asked whether he could glean any abnormal behavior from a review of the statements, Dr. Whirley answered as follows:

> No. I think the defendant–I mean, it would appear–and this is opinion, so–it would appear that he was probably nervous. I mean, in other words, sometimes questions had to be repeated. I'm sure I would have been nervous in that situation as well. But I did not–I did not hear disorganized thinking. His explanation for the need to–I mean, he was concerned about having a kidney stone, and he focused on that a great deal. But, again, according to him, he had a history of having had those. But I didn't see the grandiosity or the persecutor kind of thinking that goes with a psychosis–a paranoid psychosis.

Dr. Whirley stated that brief psychotic episodes, as a part of a "more profound mental illness," were "rare."

The defense presented a two-fold strategy. First, the defense sought to suppress the confession and, throughout the state's proof-in-chief, argued that there was not enough evidence to satisfactorily support a guilty verdict:

> It's our position that the state has failed to prove, under the proof in this case, aggravated sexual battery. In other words, they have not proven that [the victim's] intimate parts were touched. And that, under the definitions in the law, under the charge His Honor will give you, it must be proven by the state to constitute aggravated sexual battery. If they don't prove that, then they have not proven their case. And then you have to move to any lesser-included offense, or you have to move to not guilty.

In the alternative, the defendant presented an insanity defense. At the conclusion of the state's proof, and after the trial court had refused to reconsider the denial of the motion to suppress and overruled the request for a judgment of acquittal, the defense endeavored to meet its "burden of proving the defense of insanity by clear and convincing evidence." See Tenn. Code Ann. § 39-11-501(b). During summation, the defense made the following argument:

> [I]f you find that the state proved their case beyond a reasonable doubt and to a moral certainty that a crime was committed and that Ronald Weeks committed the crime, we're permitted to go forward and prove to you, by clear and convincing–not beyond a reasonable doubt and to a moral certainty–that at the time of the commission of the offense, he was suffering from a severe mental defect and didn't appreciate the wrongfulness of his actions; and, therefore, the mental component of a criminal act–a criminal act has a physical component and a mental component–is not there; and, therefore, he is not guilty by reason of insanity because this crime of aggravated sexual battery requires a specific intent to touch a child on the intimate–or in this case a child under thirteen years of age–to touch a child on intimate parts for the purpose of sexual arousal. That's what the state has to prove in this case.

The jury returned a guilty verdict on the charge of aggravated sexual battery.

I

Initially, the defendant asserts that the trial court erred by admitting into evidence the two statements given by him to Detective Jones. The defendant contends that the statements were obtained in violation of his right against self-incrimination because the detective continued the interrogation even though the defendant had responded in the negative when asked whether he wanted to give a statement. The defendant also asserts that he was not provided with any

<u>Miranda</u> warnings prior to his second statement.

The trial court's determination with regard to the voluntariness and, consequently, the admissibility of the defendant's statements is binding on appeal unless the evidence preponderates against it. <u>State v. Goforth</u>, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984).
The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V; <u>see also</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." <u>State v. Crump</u>, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>see also</u> <u>Dickerson v. United States</u>, ___ U.S. ___, ___ S. Ct. ___, No. 99-5525, 2000 WL 807223 (June 26, 2000) (affirming the continuing viability of <u>Miranda</u>). <u>Miranda</u> requires that, prior to interrogation, police inform the defendant as follows: (1) He has the right to remain silent; (2) any statement that he makes may be used against him; (3) he has the right to the presence of an attorney; and (4) if he cannot hire an attorney, one will be appointed prior to the interrogation, if he so desires. <u>Miranda</u>, 384 U.S. at 444.

The record demonstrates that immediately prior to the defendant's recorded statement, the following exchange, facilitated by the interpreter, took place between Detective Jones and the defendant:

> D.J.   I am going to ask you some questions regarding the above complaint; however, before doing so it is my duty as a police officer to advise you that you do not have to make a statement, that you have a right to remain silent and that anything you say can and will be used against you and others in court. Also, that you have a right to have a lawyer, either of your own choice or court appointed, if you are unable to afford one and to talk with your lawyer before answering any questions, and to have him with you during questioning if you wish. <u>With this understanding, do you wish to make a statement</u>?

> R.W.   <u>Uh no</u>.

D.J.     Okay. Let me tell you what I know? Okay? Uhm [the victim] came to your residence at which time went to Ms. Vicki's room, this point you pulled her panties, pants down, shorts down and panties down, uh at which time you pulled your shorts and underwear down. You laid on top of her and uh ejaculated. She is at Rape Crisis at this time.

R.W.     Not rape, not rape, rub, just rub.

D.J.     Okay don't make any statements, alright? You just told me, do you want to make a statement or do you not want to make a statement?

R.W.     Uh . . .

D.J.     This is . . . you have the right to speak with an attorney if that's what you want to do. Okay, but if you want to talk to me, then you know, this is your time to tell us what your side is? I am just basically telling you what I know, okay?

R.W.     Yes.

D.J.     Uhm. Detective Moore took [the victim] to Rape Crisis and they did locate semen on [the victim].

R.W.     Uh uh (yes).

D.J.     So do you want to make a statement or not?

R.W.     Well yes. . . .

(Emphasis added).

The defendant argues that Detective Jones' interrogation should have ceased immediately upon his responding, "Uh no," when first asked by the detective whether he wished to make a statement. The state, on the other hand, asserts that the defendant's "uh no" response was equivocal and that the detective properly sought clarification thereof. We agree with the defendant.

In our view, this question is controlled by State v. Crump, 834 S.W.2d 265 (Tenn. 1992). In Crump, the defendant was arrested after he escaped from a Department of Correction work detail. At the time of his arrest, he was also a suspect in a homicide committed on the day of his escape. Upon being arrested, the defendant was handcuffed and placed in the front seat of a squad car. A detective read his Miranda rights. When the detective asked the defendant whether, having heard

his rights, he wished to make a statement, the defendant replied either, "I don't have anything to say right now," or, "I don't have anything to say." The detective then terminated his interrogation of the defendant. Subsequently, however, another officer, hoping to gain information related to the homicide in which the defendant was a suspect, asked the defendant whether he would mind riding with him to the scene of his escape. The defendant accepted the ride and two officers took him on a 30- to 45-minute drive, retracing his escape route. Near a hotel, the officers stopped the car and asked the defendant whether he had stolen anything from a car in the parking lot. The defendant admitted that he had and one of the officers informed him that the items had been found at the homicide scene. The two officers then noted an emotional change in the defendant. Upon returning to the station, the defendant was again read his Miranda rights and, after signing a written waiver of his rights, he gave a recorded statement wherein he confessed to the homicide. The trial court found that the defendant's right to remain silent had not been "scrupulously honored" and suppressed both the statements made by the defendant in the car and the recorded confession. On appeal, our supreme court ultimately held that the trial court had correctly excluded the statements and confession:

> To fully honor an accused's self-incrimination rights, . . . "[o]nce warnings have been given, . . . [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege."
>
> \* \* \*
>
> The facts presented in this appeal clearly demonstrate that [the defendant's] right to cut off questioning by invocation of his right to remain silent was not "scrupulously honored." Thirty minutes after responding to Miranda warnings with "I don't have anything to say," he was taken on a 30 to 45-minute drive and questioned while retracing the route of his escape. This clearly constituted an impermissible resumption of in-custodial interrogation, which caused the admissions made by Crump during the drive to be inadmissible.
>
> \* \* \*
>
> After reviewing the record, we conclude that the police failure to scrupulously honor [the defendant's] invocation of his right to remain silent amounted to a violation of the defendant's state and federal constitutional rights. . . . Once an individual invokes his right to remain silent and the police fail to honor that invocation by continuing to interrogate him, that violation, by definition, is of constitutional magnitude.
>
> \* \* \*
>
> Although the officers did administer Miranda warnings before obtaining the taped confession, there were no intervening circumstances. In addition, the temporal proximity of the police misconduct to the confession was too short to purge the confession of

> the taint of the prior constitutional violation. Therefore, we find that
> the taped confession is inadmissible "fruit of the poisonous tree."

Id. at 269-70, 272 (citations omitted) (emphasis added). Upon concluding that the defendant's confession was involuntary, or supreme court reversed the conviction and granted a new trial.

By continuing with his interrogation in this case after the defendant indicated that he did not wish to make a statement, Detective Jones failed to "scrupulously honor" the defendant's constitutional right against self-incrimination. The interview should have ceased immediately when Detective Jones asked if he wished to make a statement and the defendant said, "Uh no." In our view, "uh no" is not equivocal. Equivocal, according to Black's Law Dictionary, means: "1. Of doubtful character; questionable. 2. Having more than one meaning or sense; ambiguous." Black's Law Dictionary 561 (7th ed. 1999). The word "no" is not "of doubtful character" or "questionable." Even when prefaced by a delay or the term "uh," "no" does not have more than one meaning and it is not ambiguous. In fact, "no" may be the most unequivocal word in the English language.

At the hearing on the defendant's motion to suppress the two statements given to Detective Jones, the trial court questioned the interpreter as to whether the "uh" originated with the defendant or was inserted by him. The interpreter, who had no specific recollection of the defendant's interrogation, testified that it is his practice to attempt to convey the proper spirit of what is being signed. His use of "uh" would have been intended to convey some type of hesitation, perhaps a "delayed no." Regardless, hesitation is not the equivalent of equivocation. See Webster's New International Dictionary, 1061 (3d ed. 1993) (defining "hesitation" as "the act of hesitating (as by holding back, pausing, or faltering)").

At the suppression hearing, Detective Jones maintained that the defendant had indicated that he would give a statement before he was advised of his Miranda rights. That the defendant may have changed his mind about making a statement after hearing his Miranda rights is not an equivocation. Under the circumstances, Detective Jones was simply not entitled to resume his interrogation by setting forth the facts of the alleged offense in a manner designed to invoke a response from the defendant. While Detective Jones' intent may have been to allow the defendant "to make an informed decision on whether or not to give a statement," his obligation was to ask neutral questions designed not to elicit a confession, but fashioned to clarify the defendant's position. See State v. Caldwell, 671 S.W.2d 459, 464 (Tenn. 1984); see also State v. Mosier, 888 S.W.2d 781, 785 (Tenn. Crim. App. 1994) ("If a suspect makes an equivocal or ambiguous request for counsel, police may attempt to clarify the request but can do nothing more."); State v. Kyger, 787 S.W.2d 13, 22 (Tenn. Crim. App. 1989) ("While police may clarify a suspect's equivocal request, 'this is not to say that an interrogating officer may utilize the guise of clarification as a subterfuge for coercion or intimidation.'").

Because the defendant effectively invoked his right against self-incrimination, and because Detective Jones failed to "scrupulously honor" that right, the defendant's recorded statement must be suppressed. Having made that determination, we now consider whether the defendant's written

statement taken shortly after the oral statements should also have been excluded by the trial court.

In determining whether a confession made after a constitutional violation was knowing and voluntary, this court must examine the totality of the circumstances. Crump, 834 S.W.2d at 271. Factors relevant in determining the voluntariness of a confession include (1) the length of time between the arrest and the confession; (2) the occurrence of intervening events between the arrest and the confession; (3) the giving of Miranda warnings; and (4) the purpose and flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603-04 (1975); State v. Chandler, 547 S.W.2d 918, 920 (Tenn.1977). The overriding question, however, is whether the behavior of law enforcement officials served to overbear the defendant's will to resist. State v. Kelly, 603 S.W.2d 726, 728 (Tenn.1980); see also State v. Howard, 617 S.W.2d 656, 658-59 (Tenn. Crim. App.1981).

Based upon the totality of the circumstances, it is our conclusion that the defendant's written statement was not knowingly and voluntarily made. Detective Jones recalled that after the defendant's oral statement was taken, only ten to fifteen minutes elapsed before the defendant was instructed to complete the written questionnaire. In our view, "the temporal proximity of the police misconduct to the confession was too short to purge the confession of the taint of the prior constitutional violation." Crump, 834 S.W.2d at 272.

Finally, even if a confession is inadmissible as violative of a defendant's right against self-incrimination, its admission may be harmless error in light of other overwhelming evidence. The test is whether the evidence complained of is harmless beyond any reasonable doubt. Chapman v. California, 386 U.S. 18 (1967). There must be no "reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963). Applying this standard, we cannot say that admission of the defendant's statements qualified as harmless error.

In Arizona v. Fulminante, 499 U.S. 279 (1991), the Supreme Court established that the admission of an involuntary confession may be subjected to a harmless error analysis. In Fulminante, a majority of the Court ruled that the state has the burden of demonstrating that the admission of the involuntary confession did not contribute to the conviction. While determining that the error was not harmless beyond a reasonable doubt, the Court made the following observation:

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant

> discloses the motive for and means of the crime may tempt the jury
> to rely upon that evidence alone in reaching its decision. . . .

Id. at 296 (quoting Bruton v. United States, 391 U.S. 123, 139-40 (1968)) (emphasis added) (citation omitted).

Initially, the Arizona Supreme Court had concluded that the admission of Fulminante's involuntary confession was cumulative because he had later confessed his crime to a second individual, a statement that had been properly admitted into evidence. The Arizona court determined that the error was harmless on the theory that "the jury would still have had the same basic evidence to convict" because of "the overwhelming evidence adduced from the second confession . . . ." State v. Fulminante, 778 P.2d 602, 611 (Ariz. 1989). The United States Supreme Court disagreed, holding that the jury might not have accredited the content of the second confession: "[T]he jury might have believed that the two confessions reinforced and corroborated each other." Fulminante, 499 U.S. at 299. Furthermore, the Court concluded that the admission of the first confession led to other incriminating evidence used by the state in the course of the trial. Id. at 300.

Similarly, this court cannot conclude that the erroneous admission of the confessions made by the defendant in this case was harmless beyond a reasonable doubt. The defendant's statements were the only direct evidence of the circumstances of the offense. Although the victim testified at trial, she was unable to articulate the circumstances of her encounter with the defendant. Absent the victim's testimony, the strength of the state's case depended primarily upon the impassioned statement that the victim made to her mother and that her mother repeated at trial. Because the order denying suppression preceded the notice of an insanity defense and the defense chose not to present an insanity plea until the state had concluded its proof and the trial court had reaffirmed its belief that the confession was admissible, the error appears to have had a procedural effect upon the trial as well as a substantive one.[2] In our view, the state has been unable to establish beyond a reasonable doubt that the error did not affect the verdict.

---

[2]In Noggle v. Marshall, 706 F.2d 1408, 1416 (6th Cir. 1983), the Sixth Circuit Court of Appeals held as follows:

> Fifth Amendment rights are relevant even after a defendant calls his own medical experts to the stand, with respect to the issue of his commission of the acts. Evidence of a defendant's inculpatory statements during a psychiatric examination cannot be admitted to prove guilt. To hold otherwise would make the privilege against self-incrimination illusory. Moreover, such evidence should not be permitted to affect the jury's determination on that issue to any greater extent than is inherent in an insanity plea which unavoidably may contain an admission that defendant did the act but under circumstances for which he is not responsible.

II

Next, the defendant contends that the trial court erred by denying the motions for judgment of acquittal made by him at the close of the state's proof and at the close of all the proof. He asserts that had his two statements been suppressed, the trial court would have been required to enter an order of acquittal based on the insufficiency of the evidence.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn.1983). This court may neither reweigh nor reevaluate the evidence; nor may this court substitute its inferences for those drawn by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn.1956). The evidence is sufficient when a rational trier of fact could conclude that the defendant is guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979). The defendant has the burden of demonstrating that the evidence is not sufficient when there is a challenge to the sufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982).

Aggravated sexual battery is

> unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
> * * *
> (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504(a)(4). Sexual contact is defined as follows:

> (6) "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Tenn. Code Ann. § 39-13-501(6).

Because the defendant had confessed to the crime and there was other incriminating testimony, the evidence was sufficient to support the conviction. The trial court did not, therefore,

-12-

err by refusing to grant a judgment of acquittal. The defendant is, however, entitled to a new trial because the incriminating statements should have been suppressed. Should the issue of sufficiency of the evidence arise in the next trial, the trial court may consider the proof offered by the state and rule accordingly.

III

The defendant maintains that the trial court erred by applying Tenn. Code Ann. § 40-35-114(15), that the defendant abused a position of public or private trust in committing the crime, as a sentencing enhancement factor. The defendant argues that his only relationship to the victim is that of neighbor and asserts that the victim was never placed in his care.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

If the trial court's findings of fact are adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. State v. Fletcher, 805 S.W.2d 785 (Tenn. Crim. App. 1991). The presumption of correctness is, however, "conditioned upon the affirmative showing in the record that the trial court considered sentencing principles and relevant facts and circumstances." Ashby, 823 S.W.2d at 169. The trial court must place on the record the

-13-

reasons for the sentence. Jones, 883 S.W.2d at 599.

The record in this case demonstrates that the trial court made adequate findings of fact and appropriately considered the applicable principles of sentencing. The trial court found and applied two enhancement factors: (1) that the victim was particularly vulnerable because of age or physical or mental disability, Tenn. Code Ann. § 40-35-114(4); and (2) that the defendant abused a position of public or private trust, Tenn. Code Ann. § 40-35-114(15). The trial court placed little weight on the first enhancement factor, but placed a great deal of weight on the second. With regard to mitigating factors, the trial court found three to be applicable: (1) that there existed substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense, Tenn. Code Ann. § 40-35-113(3); (2) that the defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense, Tenn. Code Ann. § 40-35-113(8); and (3) that the defendant had no prior record and had a history of being a productive member of his family and community, Tenn. Code Ann. § 40-35-113(15). The trial court then sentenced the defendant to eight years, the minimum sentence in the range. See Tenn. Code Ann. § 40-35-111(2). Accordingly, our review of the trial court's sentencing determinations is de novo with a presumption of correctness.

In our view, the evidence supports the trial court's application of Tenn. Code Ann. § 40-35-114(15). While the defendant argues that he was merely the victim's neighbor and that there is no evidence that the victim was ever placed in his care, the statute does not require a showing that the defendant was a caregiver. See State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996) ("The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship."). Moreover, this court has previously approved the application of Tenn. Code Ann. § 40-35-114(15) where a child victim was sexually assaulted by an adult neighbor. See State v. Grover Livesay, No. 03C01-9510-CC-00298 (Tenn. Crim. App., at Knoxville, Oct. 9, 1996), app. denied (Tenn. Oct. 4, 1999); State v. McKnight, 900 S.W.2d 36 (Tenn. Crim. App. 1994). There is evidence in the record to support the trial court's finding that the defendant occupied a position of private trust with regard to the victim. The defendant was a friend of the victim's father and played tennis with him frequently. Apparently, the victim had visited the defendant's home and played with the defendant's pets on more than one occasion. When asked what kind of pets the defendant owned, the victim promptly recited that the defendant had two parrots, one cat, and one dog. Accordingly, this issue is without merit.

IV

Finally, the defendant asserts that the trial court erred by failing to sentence him as an especially mitigated offender. We disagree.

A court may sentence a defendant as an especially mitigated offender if:

> (1) The defendant has no prior felony convictions; and
> (2) The court finds mitigating, but no enhancement factors.

-14-

Tenn. Code Ann. § 40-35-109(a).

Here, the trial court found two enhancement factors to be applicable. As such, the defendant failed to meet the requirements for sentencing as an especially mitigated offender and there was no error by the trial court in this regard.

### CONCLUSION

In conclusion the two statements given by the defendant should have been suppressed. The conviction is, therefore, reversed and the defendant is granted a new trial. Had the conviction been upheld, the sentence would have been affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-15-